*1007 SUMMERS, Justice.
The Gránd Jury of Orleans Parish returned a true bill on June 7, 1967 jointly indicting John Duplessis, Larry Hudson and Hayes Williams for the murder of Oscar Meeks. All of the accused entered pleas of not guilty; however, after disposition of a number of preliminary matters, on the day fixed for trial, Williams withdrew his plea of not guilty and entered a plea of guilty without capital punishment. Duplessis and Hudson were jointly tried, convicted and sentenced to death.
Each defendant reserved numerous bills of exceptions, upon which they rely on this appeal for reversal of their convictions and sentences.

Hudson’s Bill No. 1

After his arrest, prior to arraignment and before pleading or taking any other steps in his cause, when brought before the committing magistrate on May 22, 1967, Hudson requested that he be granted a preliminary examination. A preliminary examination was accordingly ordered for June 2, 1967. When the date arrived Hudson was represented by counsel. At that time the State informed the Court that a bill of information had been filed against Hudson, charging him with an attempt to commit armed robbery, and that an additional charge against him for murder was then pending before the grand jury. Acting upon this information, the judge continued the preliminary hearing to June 8, 1967. However, on June 7, 1967 the grand jury returned the murder indictment involving-Hudson, and a preliminary examination limited to the fixing of bail was not held until June 30, 1967.
The right to preliminary examination in this State is designed primarily to determine whether probable cause exists, to charge the accused. It is also an important safeguard against high-handed police procedures and third degree methods. It provides an opportunity to bring defense counsel into the picture — implementing the constitutional privilege against self-incrimination and the right to bail. See La.Code Crim.Proc. art. 296 and Preliminary Statement to Title VII, La.Code Crim.Proc. (1966). Although Article 292 of the Code of Criminal Procedure provides for an immediate preliminary examination, after the finding of an indictment or the filing of an information, an order for a preliminary examination in felony cases is a matter within the sound discretion of the presiding judge. La.Code Crim.Proc. art. 292.
As previously noted, Hudson was. represented by counsel on June 2, 1967, at which time a bill of information had been filed charging him with attempted armed' robbery. These factors, combined with the information imparted to the Court that the grand jury was then considering a charge of murder against Hudson, warranted, in *1009 •our view, the continuance of the preliminary examination until June 8, 1967, at which time, if an indictment had not been returned, the preliminary examination could have been held. The five day delay under ■these circumstances did not breach the mandate of Article 292 of the Code of Criminal Procedure directing that the judge “immediately” order a preliminary examination in felony cases.
Hudson argues, however, that the delay brought about by the continuance deprived him of his absolute right to a preliminary •examination on the question of probable ■cause. This delay, he asserts, gave the .grand jury time to return an indictment; and, as a result, his absolute right to demand an immediate preliminary examination was lost, his right thereafter being ■subject to the judge’s discretion.
Principles which underlie the right to a preliminary examination are not -violated if the preliminary examination is not held because a grand jury is then deliberating on the same matter. A preliminary examination is designed primarily to ascertain whether there is probable cause to charge the defendant with the offense (La.Code Crim.Proc. art. 296), which is essentially the same purpose served by grand jury proceedings to ascertain if the evidence in the case considered by it, if unexplained and uncontradicted, warrants a conviction. La.Code Crim.Proc. art. 443. Either proceeding provides an inquiry into the legality of defendant’s detention and thereby serves the primary objective of the law. No claim has been made that highhanded police methods or the third degree were employed here.
Nor do we feel that the law requires the district attorney to present the same case in different forums at the same time. More properly the law contemplates the right to a preliminary examination pending a grand jury hearing. When the grand jury is considering the matter, therefore, a short delay in the preliminary examination until the grand jury has acted works no prejudice to defendant. See State v. Hamilton, 247 La. 43, 169 So.2d 902 (1965).
And the language of Article 292 of the Code of Criminal Procedure requiring that the judge “immediately” order a preliminary examination in felony cases is not to be so rigidly applied that it brings about the abolition of the judge’s right to grant a continuance in these cases. La.Code Crim.Proc. art. 712.
Finally, the trial judge did grant a preliminary examination on June 30, 1968, after indictment, limiting this examination to the fixing of bail. La.Code Crim.Proc. art. 296.

Hudson’s Bills Nos. 2 and 3 Duplessis’ Bill No. 1

In answer to substantially similar motions for bills of particulars filed by each of the *1011 defendants before trial, the State replied that the murder took place at the service station at 1413 North Claiborne Avenue in New Orleans at approximately 5:20 on the morning of May 15, 1967; that the victim Oscar Meeks died around seven o’clock in the evening of May 16, 1967, of causes shown on the proces verbal of the autopsy, which was available to the accused; that a pistol was used in the commission of the crime; that the accused was being tried under Article 30, sub-section (2) of the Criminal Code; and that armed robbery was being perpetrated at the time of the killing.
The State, however, refused to furnish: particulars concerning the type or caliber of the pistol, its owner or who used it; the number of persons arrested in connection with the crime or their names and addresses; information concerning whether any of the persons arrested were released after investigation and their names; the evidence favorable to the defendant held by the police or district attorney’s office; information concerning whether defendant Hudson was placed in a public line-up without counsel, and if so how many persons were in the line-up or who was brought in to identify Hudson, and whether he was identified. These bills were reserved to the trial court’s ruling upholding the State’s answer as good and sufficient.
Counsel for Hudson argues that since he could have obtained all of this information in the preliminary examination, which was improperly denied, a more compelling basis exists to require the State to furnish information in response to his motion for a bill of particulars.
This contention is not well-founded. We have held that the preliminary examination was not improperly denied, and, moreover, it is unrelated to the motions for bills of particulars. Each presents a separate problem to be considered in light of the applicable law. Considered independently, the motions for bills of particulars were properly disposed of by the trial judge. The bill of particulars is designed to assure the defendant that he will have sufficient information before trial to properly prepare his defense. State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965). He is entitled to know what the State intends to prove; but the bill of particulars cannot be employed as a fishing expedition for a recital of the details of the State’s evidence, nor used as a device to' harass the State by demands for nonessentials. See Comment, The Bill of Particulars in Criminal Trials, 12 La.L.Rev. 457 (1952).
Murder is not one of a series of offenses where particulars are required to determine which of several offenses is being charged. It is a specific act concerning which the accused can have little doubt about the facts giving rise to the occurrence and he needs little information to put him *1013 -on guard in the preparation of his defense. Nevertheless, when the indictment is in the :short form, as it is here, the accused is entitled to a bill of particulars furnishing essential details. State v. Leming, 217 La. 257, 46 So.2d 262 (1950). Particulars furnished by the State fulfilled this requirement, and the State need go no further. Any more particularization rests within the sound discretion of the trial .judge and is limited to the furnishing of information which the judge considers necessary in fairness to permit-the accused to defend himself. State v. Bourg, 248 La. 844, 182 So.2d 510 (1966).
As we view the motions they ■are too broad, they seek the State’s evi•dence and are nothing less than an attempt ■at pretrial discovery which, with the exception of written confessions, is not permissible in this State. State v. Hunter, 250 La. 295, 195 So.2d 273 (1967).

Hudson’s Bill No. 4

Counsel for Hudson filed a “Motion for •Oyer” in which he sought, among other things, “copies of police report of investigation made in this case.” When the State refused to grant oyer, the trial judge affirmed the State’s position, and Hudson’s counsel reserved this bill. This bill lacks merit under repeated decisions of this court. State v. Cardinale, 251 La. 827, 206 So.2d 510 (1968); State v. Hunter, 250 La. 295, 195 So.2d 273 (1967).
Aside from the fact that a well-defined exception to the Public Records Act exempts police reports from its provisions (La.R.S. 44:33), the jurisprudence of this State makes it clear that all evidence relating to a pending criminal trial which is in the possession of the district attorney or the police is privileged. With the exception of written confessions of the accused, this evidence is not subject to inspection by the accused unless and until it is introduced in evidence at the trial. State v. Johnson, 249 La. 950, 980, 192 So.2d 135, 146 (1966).

Hudson’s Bill No. 5

Hudson filed a motion for severance in which he alleged that he and the two other defendants were charged with one crime; he desired to call at least one of his codefendants as a witness, and there were antagonistic defenses “between and among the defendants”. At the hearing held on the motion for severance, Hayes Williams, one of the codefendants, was called to the witness stand by Hudson. Williams, however, refused to testify, relying upon the Fifth Amendment privilege against self-incrimination. The hearing also established that the State would use no statements by any of the defendants implicating any other defendant.
No evidence was produced to establish that the defenses of the accused were antagonistic. Mere allegations of *1015 antagonistic defenses are insufficient. To obtain a severance an accused must present facts that the defenses of the codefendants are in truth antagonistic. State v. Bonner, 252 La. 200, 210 So.2d 319 (1968).
Further, a ground for severance is not established simply because the accused alleged that he desired to call one of the coaccused as a witness. State v. Vale, 252 La. 1056, 215 So.2d 811 (1968); State v. Kemp, 251 La. 592, 205 So.2d 411 (1968).

Hudson’s Bills Nos. 6 and 6-A

In his per curiam to these bills, the trial judge informs us that on October 20, 1967 he granted a continuance to November 21, 1967, and, on that date, the case was again continued by the Court to November 30, 1967 because Frank Wilson, an eyewitness to the crime whose testimony was the principal basis of the State’s case, could not be located.
The right to a speedy trial does not compel the State to try a case without a witness whose testimony is relied upon for a conviction, when a reasonable delay presents a likelihood that the witnesses’ presence at the trial is forthcoming. Decisions of the trial judge in these matters will not be interfered with in the absence of palpable abuse of discretion. We find nothing to warrant such a finding here.

Hudson’s Bill No. 7

This bill has not been briefed by defendant and is without merit. It was reserved to the denial of a motion to suppress evidence obtained as a result of a search warrant, which is alleged to be illegal, and to suppress all oral or verbal testimony obtained from Hudson during a line-up to which he was subjected after his arrest.
 Without discussing in detail the sufficiency of the affidavit filed in support of the issuance of the search warrant,, which we have examined and found entirely adequate, this bill requires no extended discussion, for the items seized (shirt and trousers) by the police were not offered in evidence, nor were statements made by Hudson at the lineup offered in evidence. And, furthermore, Article 703 of the Code of Criminal Procedure does not permit the use of the motion to suppress where oral confessions or oral inculpatory statements are involved.

Hudson’s Bill No. 8

Duplessis’ Bill No. 2

On the day of the trial, before any juror was called on voir dire, the codefendant Hayes Williams when called to the bar of the court entered a plea of guilty without capital punishment. Whereupon, counsel for both defendants moved for continuances assigning as grounds therefor the fact that the guilty plea of Williams prejudiced *1017 their clients in the eyes of the assembled prospective jurors. Inflammatory newspaper, radio and television publicity immediately preceding the trial relating to the search for Frank Wilson, a material witness in the case, was also assigned as a ground for continuance.
Denial of these motions was proper.
Nothing in the record reflects that Williams’ plea came as a surprise to defense counsel. It is difficult to conclude that they were unaware of the fact that the plea was forthcoming. Knowing the plea was forthcoming, the better practice dictated that they move in advance for the removal of the prospective jurors while the guilty plea was being tendered. Instead, counsel permitted the plea to be made and then moved for á continuance. When it was denied, they did not later establish on voir dire examination that the plea affected the jurors in such a manner that they could not try the remaining defendants impartially and be guided only by the evidence produced at the trial. Examination on voir dire establishing the partiality of prospective jurors would have furnished a basis for challenge for cause. La. Code Crim.Proc. art. 797. In fact, it was not established that the prospective jurors, seated in the audience, heard Williams enter the guilty plea. Thus we find no “good grounds” for a continuance and, as a consequence, no abuse of the judge’s discretion. La.Code Crim.Proc. art. 712.
Furthermore, Article 707 of the Code of Criminal Procedure declares that an application for continuance “shall be by written motion alleging specifically the grounds upon which it is based, and when made by a defendant, must be verified by his or her counsel’s affadavit.” Although technical in nature, this requirement has been uniformly applied in other cases and there is no suggestion that it is inapplicable here.
The contention relating to inflammatory publicity in the news media is not seriously urged on this appeal. The only evidence submitted were newspaper articles giving objective accounts of the crime and stating that the witness Frank Wilson could not be located. Again, no “good grounds” for a continuance are established by this inadequate showing.

Hudson’s Bill No. 9

Duplessis’ Bill No. 3

During voir dire examination twelve jurors were excused for cause on the State’s motion. Defendants objected to the Court’s ruling excusing these prospective jurors and reserved these bills.
Allegations in these bills of exceptions set forth that these prospective jurors were excused “because they informed the Court that they would not return a Capital verdict of Guilty as Charged but that they could return any of the other verdicts responsive in the case” and because the pros *1019 pective jurors answered “they did not believe in capital punishment.”
The per curiam of the trial judge states:
“This bill of exceptions was reserved each time one of the prospective jurors was excused for cause when he stated that under no circumstances would he return a verdict of guilty, which would necessarily condemn the accused to his death, as they did not believe in capital punishment and as it was a matter of conscience with them.
“The State, in examining the prospective jurors on their voir dire examination, has a perfect right to determine whether or not said prospective juror believes in capital punishment in the case of murder and whether or not, if the evidence justified it, if (sic) he could return a verdict which would necessarily condemn the accused to their death.
“Excusing a juror for cause, under these circumstances, would not in any way prejudice the defendants.
“The defendants, no doubt, would have been glad to have the jurors named in the Bill of Exceptions No. 3 accepted on the jury inasmuch as all of the jurors named in Bill of Exceptions No. 3 emphatically stated that, under no circumstances would they return a verdict which would condemn the accused to their death.”
Only excerpts of the voir dire examinations are available in the record furnished on appeal. Testimony which is available, however, corroborates the findings and conclusions of the trial judge. For instance, John J. Parker stated that he had long-standing, conscientious objections or scruples against the infliction of capital punishment, and under no circumstance would he convict capitally. Julium M. Reese, Raphael Tarifa, William R. Wilson, Fred Schwab and others testified to the same effect.
Although counsel for defendants have urged us to apply the rule of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, decided June 3, 1968, we are certain that this case does not come within the mandate of Witherspoon. Rather it falls squarely within an exception to the rule announced there. In Witherspoon it was held that a jury from which veniremen having conscientious scruples against or opposed to capital punishment, without stating that they would automatically vote against the imposition of such punishment no matter what the trial would reveal, fell short of that impartiality to which petitioner was entitled under the Sixth and Fourteenth Amendments, and that under these circumstances the execution of the death sentence would deprive petitioner of his life without due process of law.
To make this holding emphatically clear the Witherspoon court declared:
*1021 “We repeat, however, that nothing we say today hears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakeably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, * * * ”
The clear import of the statements made by the prospective jurors excused for cause is that they would not return a death verdict under any circumstance — regardless of the proof at the trial. Hence this case falls squarely within the quoted exception to the rule established by the Witherspoon case, and for that reason the twelve jurors were properly excused for cause.
Here the trial judge was not content to excuse these prospective jurors simply because they expressed conscientious scruples against the infliction of capital punishment, the test prescribed by Article 798 (2) of the Code of Criminal Procedure:
“It is good cause for challenge on the part of the state, but not on the part of the defendant, that: * * * (2) The juror tendered in a capital case has conscientious scruples against the infliction of capital punishment.”
If the challenge had rested on this test alone the rule of the Witherspoon case would, at least, have invalidated the punishment here. But, by persisting in an inquiry which determined that each prospective juror who was excused would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial, the trial court judge assured compliance with the due process requirements of the Sixth and Fourteenth Amendments and the impartiality of the jury which convicted' these defendants.

Hudson’s Bills Nos. 10 and 11

Duplessis’ Bill Alo. 4

On the morning when Oscar Meeks was shot, Officer Edward Lambert was patrolling the neighborhood. A Negro man in an automobile pulled up and informed him that an armed robbery was in progress at the Tenneco Service Station at 1413 North Claiborne Avenue. Within forty seconds Lambert arrived at the Tenneco Station, jumped out of his automobile and beheld Oscar Meeks holding Duplessis at gunpoint. Rushing from his car Officer Lambert exclaimed, “What’s happening?” Whereupon Meeks declared, “This is one of the three subj ects that attempted to hold me up.” Meeks also told Lambert that “Duplessis had come into his station with a tire and said he wanted to get a tire fixed and then one of the colored males pulled *1023 a gun on him and told him to give him the money, that they wanted the money. Then he said the subject with the gun shot him.”
When the State introduced Lambert’s testimony relating what Meeks said as part of the res gestae, defense counsel objected to the testimony as hearsay.
In Louisiana, res gestae is defined as follows:
“Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms any part of the res gestae is always admissible in evidence.” La. R.S. 15:447.
“To constitute res gestae the circumstances and declaration must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.” La. R.S. 15 :448.
The declarations of Meeks were part of one continuous transaction which began when the defendants came into the service station and demanded Meeks’ money. When Meeks halted Duplessis at gunpoint, holding him until the arrival of police, his actions and declarations in doing so were immediate concomitants of the shooting and the murder, which was not then consummated, for Meeks, though mortally wounded, was to live until the next afternoon. These declarations were made under the immediate pressure of the occurrence, the fatal shot having been fired only moments before. They were therefore admis- . sible as part of the res gestae.
We are of the opinion, moreover, that the testimony of Officer Lambert was admissable not only to prove the truth of the statements, but also to show the fact that such statements were made. The fact of the statements has a relevance independent from the truth thereof. Pugh, Res Gestae, 18 La.L.Rev. 144 (1957).

Hudson’s Bill No. 12

While Officer Lambert was testifying, laying the predicate for res gestae testimony, a recess was called. Later the State completed its questioning of Lambert and tendered the witness on the predicate to defense counsel for cross-examination. Hudson’s counsel then asked the witness: “Q. Officer, during this recess, while the jury was out and we had a recess, did you talk to the District Attorney about your testimony * * * After you had already been sworn?” When the District Attorney objected to the question, Hudson reserved this bill. We see no merit to the bill. Although we are satisfied that it was proper for the District Attorney to talk to a State witness during a recess, we likewise understand that counsel for the defendant can elicit this fact on examina *1025 tion of the witnesses. However, though technically in error, the ruling is not a proper basis for reversal. The question, objection and ruling occurred outside the presence of the jury, while the State was laying a predicate for the introduction of testimony as part of the res gestae. No influence upon the jury verdict was possible under these circumstances. Moreover, the District Attorney, in effect, acknowledged speaking to the witness, thus supplying the answer sought by the question. No miscarriage of justice resulted from this ruling. La.Code Crim.Proc. art. 921.

Hudson’s Bill No. 13

Duplessis’ Bill No. 5

Defense counsel, while cross-examining the State’s principal witness, Frank Wilson, asked: “Did you tell the Grand Jury the same thing you’re telling this Court here today?”
Testimony of witnesses before a grand jury is secret. La.Code Crim. Proc. art. 434. And witnesses who appear before the grand jury are required to take an oath to keep secret, except as authorized by law, matters which they learn at the grand jury meeting. La.Code Crim. Proc. art. 440. These requirements of secrecy are imposed so that those whose indictment may be contemplated will not flee, or importune the grand jury; to assure freedom in the jury’s deliberations; to deter subornation of perjury or tampering with grand jury witnesses who may testify at the trial; to encourage the free disclosure of information relative to crimes and to protect the innocent accused from disclosure of the fact that he has been under investigation. See Comment, La.Code Crim.Proc. art. 433.
To permit a review of the evidence considered by the grand jury would destroy the veil of secrecy with which the law surrounds both the proceedings and the testimony presented to the grand jury. See Comment, La.Code Crim.Proc. art. 442. Having failed to establish that the question was proper under one of the exceptions to the rule of secrecy authorized by law, defendants have no right to demand disclosure of grand jury testimony. La.Code Crim. Proc. arts. 434, 440. The trial judge properly sustained the State’s objection to this question.

Hudson’s Bill No. 14

Duplessis’ Bill No. 16

Identical bills were reserved while the State witness Frank Wilson was being cross-examined by defense counsel, based upon the following questions and answers:
“Q. Mr. Wilson, you say you never saw this gun before May IS, 1967 ?
A. I never saw it.
Q. Have you seen it since, prior to coming in Court this afternoon?
*1027 A. I’ve seen it just now.
Q. But you’ve never seen it since May 15, 1967, until right now?
A. I saw it when Mr. Meeks had it and saw it now.
Q. Now, when you came in Court today?
A. Yeh, that’s right.
Q. How do you know it’s the same gun?
A. Because I know it’s the kind he had.
Q. Did the district attorney tell you that it was the same gun?”
At this point the State’s attorney objected and declared:
“I object to that, Your Honor. This man has been insinuating during the entire trial * * * I object to the question with the insinuation I told this witness to say something on the witness stand * * * I think the Court knows I’ve tried enough capital cases out here and I’ve got a good enough reputation in the courtroom — that I would (not) sit with a witness and tell the witness what to say on the witness stand, to try to fool jurors or the Court * * * That’s why I object, Your Honor.” (Parentheses added.)
Whereupon the defendants moved for a mistrial based upon the self-serving testimonial statements made by the District Attorney. The motion for a mistrial was overruled, and these bills were reserved. They are without merit. The remarks of the District Attorney were designed primarily to preserve his integrity and were in no way prejudicial. They are within the latitude accorded counsel in an adversary proceeding.

Hudson’s Bills Nos. 15, 16 and 17

Duplessis’ Bills Nos. 7 and 8

At the close of its case, the State was allowed by the Court to introduce into evidence a photograph of the body of Oscar Meeks depicting the deceased from the waist up, a tire, a .25 caliber automatic pistol, a bag containing five live .25 caliber cartridges and two spent .25 caliber casings, a .35 caliber Smith and Wesson revolver and a pellet. Defense counsel objected to the introduction of these exhibits and their objections were overruled.

The Picture

Essentially the objection to the photograph of the deceased is that it was “one of the entire body of the decedent, rather than just the head and was inflammatory and not for the purpose of identification.” (Actually the photograph depicted the deceased from the waist up.)
In testifying as to the cause of death, Dr. Ignacio Medina, Jr., Assistant Coroner of the parish of Orleans, who *1029 performed the autopsy on Meeks, referred to the photograph, constantly indicating thereon with a pen the points where the fatal bullet entered Meeks’ body on the left side of the chest and left Meeks’ body on the right side of the abdomen. The purpose of introducing this picture in evidence was to identify Meeks, to corroborate the testimony of Dr. Medina, and to show the cause of death. Our statement in State v. Rideau, 249 La. 1111, 1133, 193 So.2d 264, 272 (1967) is appropriate here:
“The state, of course, is required to prove the identity of the deceased, the death, and the cause of death. The photograph was strongly probative of these facts. * * *
“A death scene, of course, has its gruesome aspect. But the relevance of the photograph outweighed its emotional danger.”

The Tire

Frank Wilson, the filling station attendant who was present when Meeks was shot, testified that when Hudson, Duplessis and Williams filed into the Tenneco Station one after the other just before dawn on the date of the crime, Duplessis, the second man in line, was carrying a tire, and that after Hudson demanded money and shot Meeks, Duplessis threw the tire down on the sidewalk, where the police found it after they arrived to investigate the crime. Detective John April testified during the trial that the tire containing his initials marked for identification S-6 was the one he had retrieved from the Tenneco Service Station shortly after the commission of the crime.
Hudson’s Bill of Exceptions No. 16 recites that none of the witnesses connected Hudson with the tire, that the tire was not shown at the trial to be in the same condition as it was on May 15, 1967, the date of the crime, and that “the tire was not shown to be the same tire kept in the custody of the police or anyone else since the date of the alleged crime.”
There is no merit to the objection to the introduction of the tire. Hudson walked into the service station ahead of Duplessis, who was carrying the tire in question, and asked Meeks how much it would cost to fix the tire. It is clear from the evidence that Hudson and Duplessis used the tire as a ploy to gain entrance to the station office as a prelude to a planned robbery. As the tire was only a prop, its condition on the date of the crime and at the time of the trial was irrelevant, as was the question of its custody pending trial. The trial judge acted properly in admitting the tire into evidence.

The Guns

The .25 caliber automatic pistol was identified by Wilson as Meeks’ gun, used by Meeks to hold Duplessis until the police *1031 arrived. Wilson also identified the Smith & 'Wesson revolver as the gun Duplessis had under his shirt while the crime was being committed and which Meeks made Duplessis throw to the ground after Wilson warned Meeks, “Watch him; he's got a gun.” The five live .25 caliber cartridges and two spent .25 caliber casings were taken by a policeman from Meeks’ gun. The pellet was identified by Dr. George Hobson, Director of the Veterans Administration Hospital, as the bullet removed from Meeks’ body the day he was shot.
In Hudson’s bill 17 it is alleged that
“(T)here is not a scintilla of evidence in the testimony of all of the witnesses which tied the exhibits to the defendant, Larry Hudson, and for tire reason that if the defendant Larry Hudson had been tried individually, the exhibit would not have been admissible and for the reason that the pellet, S-ll, was not shown to have been the same pellet that was removed from the body of Oscar Meeks.”
This allegation is palpably erroneous and completely unfounded. Hudson, with Duplessis and Williams, were perpetrators of a cold-blooded murder by their joint actions. Until after the shooting occurred they acted as a team and the evidence admitted pertained to each and all of them acting in concert.

Hudson’s Bills Nos. 18 and 19

Duplessis’ Bill No. 9

At 5:30 in the afternoon on the second day of the trial, the trial judge, at the request of counsel, permitted them to approach the bench to discuss whether to work late that night or recess until the next morning. During this discussion the judge said: "For the purpose of the jury, if I come back, we’ll work late. But then the Court gets criticized by lawyers for overworking them and they complain to the appellate courts, The Supreme Court. They complain about it.” No objection was made at the time to these remarks and defense counsel expressed a willingness to work that night. Court then recessed for dinner until eight that evening.
At eight o’clock the trial resumed. At 10:20 that night the State rested, and the judge ordered a five minute recess. At this time counsel for Hudson reserved a bill of exceptions to the quoted remarks of the Court made about five hours earlier. Defense counsel also asked for a recess until the following morning and when the request was denied another bill was reserved. About one half hour later, however, defense rested and, as the State had no rebuttal, the trial was recessed until ten o’clock the following morning.
These bills are without merit. The judge’s remarks were undoubtedly inappro *1033 priate, but we are unable to find in them any language which would prejudice defendants. The other obj ections upon which these bills rest are frivolous on their face, fall far short of a denial of any legal right and fail to establish any prejudice to defendants.

Hudson’s Bill No. 20

At the conclusion of the State’s case Hudson’s counsel moved for a directed verdict, alleging there was “no evidence or believable evidence sufficient to warrant the case to go to the jury.” The Court denied the motion. In his per curiam the trial judge set forth that he felt “the State’s evidence had, beyond a reasonable doubt, made out a prima facie case against both defendants.”
The first paragraph of Article 778 of the Code of Criminal Procedure, which is pertinent to this bill, provides:
“In a jury trial the court may direct a verdict of not guilty of one or more of the offenses charged, on its own motion or on that of a defendant, after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.” (Emphasis added.)
This article purports to permit the judge of the trial court in a jury trial involving a crime punishable by death to determine the sufficiency of the evidence to sustain a verdict of guilty. If, in the judge’s opinion, the facts are insufficient he may direct a verdict of acquittal. What Article 778 does, therefore, is to invest in the trial judge the power to determine whether there are enough facts to sustain a guilty verdict. If he is not satisfied that the facts sustain a guilty verdict, he may direct a verdict of not guilty. In effect, the judge becomes a trier of fact on questions of guilt or innocence.
This legislative enactment is repugnant to the constitutional guarantee that, “The jury in all criminal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge.” La.Const. art. XIX, Sec. 9 (1921) ; State v. Gatlin, 241 La. 321, 129 So.2d 4 (1961); State v. Broussard, 217 La. 90, 42 So.2d 48 (1950). Questions of guilt or innocence can only be decided by the jury under the plain language of the Constitution. Judges must decide only those fact questions which do not relate directly to guilt or innocence. State v. Hayes, 162 La. 917, 111 So. 327 (1927).
The right to trial by jury in a capital case is as old as the State itself. La.Const. art. VI, Sec. 18 (1812). Power to determine guilt or innocence in capital cases has not been vested in judges by the Constitution; instead the people have re *1035 served that power to juries. When the death penalty is involved the guarantee of the Constitution is twofold: The accused is assured a jury trial in his contention for acquittal, and the State is assured a jury trial in its contention for a conviction. In these trials the jury is the repository of the standard of justice in the community.
In addition, Article VII, Section 10, of the Constitution limits the appellate jurisdiction of this Court in criminal cases to “questions of law only”. Read in connection with Article XIX, Section 9, this means that we can neither determine facts nor review the correctness of the findings of the trier of fact. It is a logical and inescapable step from this conclusion to realize that this limitation of our appellate jurisdiction in criminal cases would not permit this Court to review the trial judge’s determination of the “sufficiency” of the evidence.
Although we have often held that a question of law is presented by a contention that there is no evidence to support an essential element of the crime, the sufficiency of the evidence may not be questioned, and if there is any evidence, no matter how little, the conviction cannot be upset for to do so would require a decision on a question of fact and not of law. State v. Moye, 250 La. 117, 194 So.2d 717 (1967); State v. Cade, 244 La. 534, 153 So.2d 382 (1963); State v. Gatlin, 241 La. 321, 322, 129 So.2d 4 (1961).
Since the issue presented by this bill requires a determination of the extent of this Court’s jurisdiction, it has been necessary to decide constitutional questions which were not urged. Questions affecting our jurisdiction, however, are properly decided on our own motion. Finding that the sufficiency of evidence touching upon guilt or innocence can only be decided by the jury, we hold that the trial judge cannot decide that question and we cannot consider the sufficiency of the evidence on appeal. To do so would amount to an unconstitutional extension of our jurisdiction. Hence this bill is without merit.

Hudson’s Bill No. 21

 After the State and the defense had rested, defense counsel sought to introduce a photograph into evidence, to which he had referred in cross-examining the State’s witness Frank Wilson. When the State objected the objection was sustained. The introduction of evidence after the case has been presented by the State and the defense rests is in the discretion of the trial judge. La.Code Crim.Proc. art. 765. We find no abuse of discretion. Moreover, the predicate for the introduction of this photograph had not been established, the defense having failed to show who the photograph purported to represent, when it was made and by whom.

*1037
Hudson’s Bill No. 22

Duplessis

[1]

 Bill No. 11

In answer to an argument to the jury made by defense counsel, the prosecutor in his closing argument said:
“If Mr. Screen (defense counsel) wants you to believe that Hayes Williams is the trigger man and the only one that shot and killed Mr. Meeks and that he was involved in a scuffle with Mr. Meeks and that both were drinking, probably, why didn’t he call Hayes Williams and put him on the stand and ask him that?”
Defense counsel objected to this statement and asked for a mistrial, which the Court denied, after which these bills were reserved.
Although Hayes Williams had been jointly indicted for the murder of Oscar Meeks along with Hudson and Duplessis, Williams had pleaded guilty without capital punishment at the very beginning of the trial; Williams, therefore, could have been called as a witness to testify during the trial of this case. The failure of Williams to testify was a fact upon which the prosecutor could comment in his argument to the jury and these bills are without merit. La. Code Crim.Proc. art. 774.

Hudson’s Bills Nos. 23 and 25

Duplessis" Bill No. 10

These bills were reserved to the refusal of the trial judge to declare a mistrial when the prosecuting attorney made the following statements to the jury as part of his closing argument:
“In this case, on the facts we have, where is there anything which would warrant mercy or clemency in this case? There isn’t any evidence that would warrant mercy or clemency on your part * * $»
* * * * * *
“The State then called Detective DeSale of the Homicide Bureau concerning the arrest of the defendant, Larry Hudson. Detective DeSale testified that he was investigating the case on May 17th with his partner, Sgt. Robert Hamilton. During the course of the investigation he said he interviewed Cynthia Brown. He then testified that he had occasion, in the course of his investigation, to see John Duplessis, the defendant, on the morning of May 17th. Sgt. Hamilton was also present at this time, according to his testimony. Detective DeSala testified he again saw John Duplessis on this same date, May 17th. He testified that as a result of his conversation with John Duplessis * * *.
* * * * * *
“The question propounded to Detective DeSale was a general one. Was anybody identified in the showup? What about after the showup? Was Wilson taken to be interviewed? Larry Hudson wasn’t released after that showup. Yop think *1039 just maybe Larry Hudson was identified by Wilson in the Detective Bureau after the showup?”
We view these statements as nothing more than permissible argument, inferences and conclusions which the District Attorney properly drew from testimony in the record. And where an opinion is expressed, if it is based upon the evidence of record, as it is here, it is not the expression of a personal opinion. La.Code of Crim.Proc. art. 774; State v. Sercovich, 246 La. 503, 165 So.2d 301 (1964).

Hudson’s Bill No. 24

Counsel for Hudson requested that the trial judge give the following special charges to the jury, which the Court denied.
“1.
“Under' the definition of murder is Homicide without a design to effect the death of the victim (sic) ; but in the commission of a felony. All of the elements of the felony must be presented and established beyond a reasonable doubt, otherwise the defendants or any of them cannot be convicted of murder. It must also appear from the evidence and beyond a reasonable doubt that the homicide occurred in the actual commission of the felony.
2.
“The felony that must be proven in this case is Armed Robbery. All of the elements of this crime must be proved beyond a reasonable doubt in order to furnish a basis for a finding by the jury, of murder. If any one element has not been proven beyond a reasonable doubt as to each defendant, the defendant against whom it has not been proven cannot be convicted of murder.
3.
“The evidence must prove beyond a reasonable doubt that the defendants, each of them, were actually present at the time the crime was alleged to have been committed, before the jury can convict any one of them. If the evidence does not satisfy each individual juror beyond a reasonable doubt that the defendants, each of them, were actually present at the time the crime is alleged to have been committed, then the defendant or any of them against which it has not been proven cannot be convicted.
4.
“The actual presence of the defendant at the alleged scene of the crime is a material fact to be proven by the State and like every other material fact necessary to make out the State’s case, must appear beyond a reasonable doubt, otherwise the defendant must be acquitted, against whom it has not been so proven.”
The first requested charge is incorrect in that it is so vague and indefinite it would serve only to confuse the jury.
*1041 The second requested charge is also incorrect for the felony to be proved in this case is either armed robbery or attempted armed robbery as the trial judge explained in his general charge.
 The third and fourth requested charges are neither correct nor factually pertinent. It was not required that each accused be present at the time of the shooting and attempted robbery to be guilty of murder. However, these defendants, according to the evidence, were present and the requested charges were, therefore, not pertinent. See La. Code Crim.Proc. art. 807.

Hudson’s Bill No. 26

Diiplessis’ Bill No. 12

Each defendant filed motions for new trials which were denied. These motions are based upon the bills of exceptions which we have considered separately and found to be without merit. The motions for new trials are likewise without merit.

Hudson’s Bill No. 27

Diiplessis’ Bill No. 13

Motions in arrest of judgment were filed founded upon the proposition that in order to sustain this prosecution it was necessary to prove that the killing occurred while an armed robbery was being committed. Since there was no proof that anything of value was taken, only an attempted armed robbery was proven. A verdict of guilty of murder was, therefore, not responsive to the indictment. La.Code Crim.Proc. art. 859.
The answer to this question can be found in Article 30 of the Criminal Code which declares: “Murder is the killing of a human being, * * * (2) When the offender is engaged in * * * the attempted perpetration of * * * armed robbery * * ”
This indictment charged that defendant murdered Oscar Meeks and the verdict returned was “guilty as charged”. The verdict is undoubtedly responsive to the indictment. The State advised defendants that they were being prosecuted under Article 30(2) of the Criminal Code. The fact that the State, in answer to a motion for bill of particulars, also advised defense counsel that the murder was perpetrated while the defendants were committing an armed robbery does not have the effect of amending the indictment so that proof of an attempted armed robbery could not be shown to sustain the prosecution. The State’s answer to the bill of particulars is nothing more than an expression of what it intends to prove. And if its proof falls short of its goal, but is still sufficient to sustain a verdict under the law, no prejudice has resulted to the accused by the inaccurate answer. The motions in arrest of judgment were properly denied.
The convictions and sentences are affirmed.

. In State v. Daspit, 167 La. 53, 118 So. 690, it was said: “The district judge makes it very plain that he deemed it to be not his province, but the province exclusively of the jury, to determine whether the evidence in the case proved the guilt of the accused beyond a reasonable doubt. It was for that purpose alone, and not because of his own judgment or appreciation of the evidence, that the judge de- ' dined to grant a new trial. The defendant was therefore denied his right to have the judge determine, according to his own judgment, whether the verdict was justified by the evidence. The judge should have exorcised his judgment and authority in that respect. State v. Sweeney, 37 La.Ann. 2; State v. Seipel, 104 La. 67, 73, 28 So. 880; State v. Miller, 107 La. 797, 798, 32 So. 191; State v. John, 109 La. 1088, 1089, 34 So. 98; State v. Hauser, 112 La. 313, 314, 36 So. 396; State v. Maloney, 115 La. 498, 509, 39 So. 539; State v. Varnado, 128 La. 883, 885, 55 So. 562.” Note that all the cited cases recognized the trial court’s right of review of the sufficiency of the evidence even before our first Code of Criminal Procedure (1928) was adopted.